```
IN THE UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF NEBRASKA
```

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　　Plaintiff,<br><br>vs.<br><br>$35,890.00 IN UNITED STATES CURRENCY,<br><br>　　　　　　　Defendant. | 8:14CV404<br><br>**MEMORANDUM AND ORDER** |

　　　This matter is before the court for a final decision on the government's complaint for forfeiture of $35,890. The defendant currency was seized during a traffic stop conducted in Omaha, Nebraska on June 14, 2014. Douglas County Deputy Sheriff Dave Wintle initiated the traffic stop. Eliyah Bell was driving the stopped vehicle; Derrick Anderson was a passenger. The vehicle, a Hyundai Sonata, had been rented by Derrick Anderson's fiancé, Giacoma Telich, who was not in the vehicle at the time of the stop.

　　　The government claims the seized currency is proceeds from, or was being used in furtherance of, illegal drug trafficking activity. Claimant Terry Anderson is the brother of passenger Derrick Anderson. Terry Anderson claims he is an innocent owner of the seized money, having saved money since the '90s, and supplementing that savings with a $10,000 workers compensation settlement received from a past employer and a $10,000 gift received from Zenith Anderson, his sister.

　　　For the reasons discussed below, the court finds the defendant currency was derived from illegal drug activity, Claimant Terry Anderson is not the innocent owner of that money, and the money will be forfeited to the United States.

# FACTUAL ANALYSIS

1. **Government's Trial Evidence.**

On June 14, 2014, Deputy Wintle, accompanied by his canine partner, Kubo, was patrolling the traffic on Interstate 80 in Omaha, Nebraska. At approximately 10:00 a.m., he observed a westbound Hyundai Sonata change lanes from the inside left lane to the middle lane of the interstate, swerving into the far right lane as he did so. The driver did not signal the lane change. Deputy Wintle initiated a traffic stop by activating his overhead lights. The vehicle promptly pulled over and stopped. See Ex. 1 (in-car camera video recording).

Deputy Wintle approached the front passenger side of the vehicle and asked for vehicle information and Bell's driver's license. Bell produced an Ohio identification card, but he did not have a driver's license, and he could not produce the vehicle rental agreement.

Bell was seated in Wintle's patrol vehicle. Deputy Wintle returned to the rental vehicle and spoke with Derrick Anderson. He then returned to the patrol vehicle, advised Bell of the reason for the stop, and contacted dispatch to gather vehicle information, and any criminal history and pending warrant information on both Bell and Derrick Anderson. While waiting for information from dispatch and completing a warning ticket, Deputy Wintle asked Bell about the origin, purpose, and destination of his trip. Bell stated he was heading for vacation, but did not know the destination; perhaps Las Vegas. During the traffic stop, Bell stated he had been on the road for "a couple of hours," (Ex. 1, at 10:14:20-27), but based on the trial testimony, Bell and Derrick Anderson had left Cincinnati, Ohio that morning. Cincinnati is over 700 miles from Omaha, Nebraska.

Dispatch contacted Deputy Wintle and stated Bell's driver's license was suspended and that Bell appeared to be the subject of a pending arrest warrant. But dispatch needed to contact Florida to confirm that the warrant was still valid and determine whether Florida was willing to extradite Bell.

While waiting for this additional information, Deputy Wintle asked Bell if he possessed any weapons, drugs, or substantial amounts of cash. Bell answered "No." Based on Bell's inability to state his own vacation destination, along with the initial report of a potential pending warrant, Deputy Wintle suspected Bell may be engaged in illegal activity. He asked for permission to search the vehicle. Bell responded that the officer needed to ask Derrick Anderson for consent.

Deputy Wintle approached the passenger side of the stopped vehicle and spoke to Derrick Anderson. Derrick Anderson explained his fiancé had rented the vehicle, but he could not produce the rental agreement. In response to the officer's questions, Derrick Anderson stated he and Bell were en route to Los Angeles and planned to spend a couple of days there before returning home. Deputy Wintle asked for consent to search the vehicle, but Derrick Anderson refused.

Approximately 20 minutes after initiating the traffic stop, and while still awaiting further information from dispatch regarding the validity of the reported arrest warrant,[1] Deputy Wintle removed Kubo from his patrol vehicle to perform a canine sniff of the stopped vehicle.

---

[1] Dispatch was unable to confirm the warrant until after the stop was complete and the rental vehicle had been towed to the Sheriff's facility. The warrant was valid and Florida was willing to extradite. Bell was arrested, booked as a fugitive from justice, and extradited to Florida to face his pending charges. He did not testify at the trial for this case.

Deputy Wintle and Kubo were trained as a canine team in 2006. That training included teaching Kubo to detect, alert, and indicate to the odor of marijuana, cocaine, methamphetamine, and heroine, including detection of these odors on currency. Kubo was not trained to respond to the odor of currency alone. In July of 2006, Deputy Wintle and Kubo became a certified drug-detection canine team. They were re-certified annually and between those annual re-certifications, they continued to train. In addition to re-certification testing, approximately once a year, Kubo was further tested to see if he would respond to the odor of circulated currency withdrawn from a local bank. Kubo passed all certification and re-certification testing, and he never alerted or indicated to either circulated or uncirculated currency alone.

Kubo's method of alerting Deputy Wintle to the odor of illegal drugs began with behavior changes such as deep breathing. Kubo would then continue to search for the source location, and once he found it, Kubo indicated the source by sitting and staring.

Deputy Wintle commanded Kubo to begin a sniff of the Hyundai Sonata, starting with the trunk and moving counter-clockwise. As he walked around the vehicle, Kubo sniffed harder and louder on the driver's side. He indicated to the odor of illegal drugs by sitting and staring at the vehicle's trunk.

After returning Kubo to Deputy Wintle's vehicle, Bell and Derrick Anderson were patted down. Nothing was found. Deputy Wintle, now joined by another officer, began a search of the vehicle, starting with the vehicle's trunk. Inside the trunk, they saw a CityGear plastic bag inside a duffel bag, luggage, and a Seal-a-Meal vacuum food sealer. (Exs. 6-8, 12). Within the CityGear bag, the officers found a gray plastic sack, and within that sack, another gray plastic sack containing 18 bundles of cash, $2000 per bundle, for a total later confirmed to be $35,890. (Exs. 9-11, 16). During a further

search of the vehicle, he found an unopened air sanitizer in a driver's side door compartment. (Exs. 13-14).

Deputy Wintle, an experienced law enforcement officer with extensive drug interdiction training, believed the wrapping and bundling of this cash was consistent with drug trafficking, he suspected the vacuum food sealer was being used to package drugs for sale, and he considered the unopened air sanitizer—an unusual thing to find in a rental vehicle—consistent with planning to later use that vehicle for transporting illegal drugs.

Deputy Wintle returned to his patrol vehicle and asked Bell and Derrick Anderson about the money. Both denied ownership; Derrick Anderson signed the form disclaiming any ownership or right to recover the cash. (Exs. 4-5).

Deputy Wintle called Zenith Anderson and Giacoma Telich to locate the owner of the money. Zenith Anderson stated the money belonged to Terry Anderson, who was planning to use it for an upcoming surgery. She did not know how much cash was present or how it was packaged, and stated some of the money was hers but she did not know how much. She explained that Terry Anderson put the money in the rental vehicle trunk when she was not present.

Giacoma Telich stated she rented the car so Derrick Anderson and Bell could travel to Los Angeles and buy property. Initially she stated she knew nothing about any money in the vehicle. In the same conversation, she also acknowledged there was money in the trunk, but she did not know how much money or how it was packaged.

After towing the rental vehicle to the station, Deputy Wintle and Kubo performed a discretionary sniff of the currency. Kubo was deployed in a room with several lockers, none of which contained anything with the odor of drugs. Kubo did not alert or indicate

and was removed from the room. An officer then hid the currency removed from the rental vehicle in one of the lockers. Kubo was again deployed to search the room. He alerted to the odor of drugs, and indicated it was emanating from the locker which now contained the hidden currency.

Bell and Derrick Anderson were placed in interview rooms. Bell requested counsel and was not interviewed. Derrick Anderson was advised of his <u>Miranda</u> rights and agreed to answer questions. During that interview, Derrick Anderson explained that he is a car detailer who makes about $30,000 a year. Derrick Anderson stated the money in the trunk was not his, and he did not know how the money got into the trunk or how much money was there. But the money in the vehicle may belong to his brother, Terry Anderson, who was saving for a surgery.

The currency was seized, Derrick Anderson was released, Bell was booked as a fugitive from justice, and the rental car was photographed and impounded.

Deputy Wintle spoke with Terry Anderson four days later, on June 18, 2014. Terry Anderson stated the money in the vehicle was his, he was saving money for a surgery, and approximately $11,000 of the money was loaned to him by his sister, Zenith Anderson. Terry Anderson stated he earns approximately $35,000 per year as an over-the-road trucker. He explained he placed the money in the trunk of the rental vehicle and forgot to remove it before Derrick Anderson and Bell left on their trip.

### 2. **Claimant's Trial Evidence**.

Derrick, Zenith, and Terry Anderson provided trial testimony in support of Terry Anderson's claim. Derrick Anderson has a prior felony conviction for trafficking marijuana, and after spending two years in jail, was released in 2011. He testified that

6

the vehicle stopped on June 14, 2014 was rented by Telich, his fiancé, two days before the traffic stop. Derrick Anderson explained that at the time of the stop, he did not own a vehicle. He testified that Telich rented the vehicle so Bell and Derrick Anderson could go on a planned vacation.

Derrick Anderson testified that before leaving Cincinnati, he used the rental car to pick up a nephew and some friends and drive to Zenith Anderson's home for dinner. He arrived at Zenith's home in daylight, but left after dark. Although he had not driven Terry Anderson to their sister's home, when he left, Derrick Anderson gave Terry Anderson and Bell a ride home. He then went home himself, went to bed, and woke up when it was still dark to begin driving to Las Vegas to gamble. Derrick Anderson testified that he had never been to Las Vegas before and he intended to stay there a few days, but he had no lodging reservations. He could not state when the vehicle was supposed to be returned to the rental company or how long he had possessed it before beginning the trip.

Derrick Anderson testified that he did not place the vacuum food sealer in the vehicle trunk. Although he claimed Terry Anderson owned the money in the trunk, he also stated he was not aware Terry Anderson kept large amounts of cash.

Zenith Anderson testified that she gave $10,000 to Terry Anderson, who was saving money for weight reduction surgery. She said Terry Anderson was paranoid about banks so he kept large amounts of money in his home. She stated Derrick and Terry Anderson were at her home the day before the traffic stop, and while they were there, Terry Anderson did his laundry. She could not recall if anyone else was present that day.

Claimant Terry Anderson testified that he has worked as a commercial truck driver since 2005, earning $35,000 to $45,000 per year. (Exs. 102-110). He explained the

money in the trunk was his: He had accumulated by saving money for more than two decades, augmenting that total with the $10,000 received as a worker's compensation settlement, and a $10,000 gift from his sister, Zenith Anderson. (Ex. 101). Terry Anderson testified that he has a bank account. The worker's compensation settlement was deposited into the bank and then withdrawn in cash, and his wages are directly deposited and then withdrawn. Terry Anderson testified that he bundles and bands the withdrawn cash it so it's easier to count, and places it in his bedroom closet.

Terry Anderson owned a vehicle in June of 2014. However, he testified that on the day prior to the traffic stop, Derrick Anderson picked up Terry Anderson with the rental car and drove first to a laundromat so Terry Anderson could do his laundry, and then to Zenith Anderson's home. Terry Anderson testified that when he was picked up at his house, he placed a bag with a partial load of laundry and the money from his bedroom closet into the trunk of the rental vehicle. He testified that he intended to move the money to Zenith Anderson's house because a robbery had recently occurred at his apartment building. Terry Anderson testified that the money must have come out of the bag while it was in the trunk, he forgot it was there, and he never brought it into his sister's home. He claims he tried to call Derrick Anderson about the money the next day, but his brother did not answer the phone.

## LEGAL ANALYSIS

The United States alleges that the Currency is subject to forfeiture under 21 U.S.C. § 881(a)(6), which states:

> The following property shall be subject to forfeiture to the United States and no property right shall exist in them: . . . (6) All moneys, . . . furnished or intended to be furnished by any person in exchange for a controlled substance . . ., all proceeds traceable to such an exchange, and all moneys, .

> . . used or intended to be used to facilitate any violation of [the Drug Abuse Prevention and Control Act].

21 U.S.C. § 881(a)(6). In a forfeiture action, the government has the burden of establishing by a preponderance of the evidence that the seized property is substantially connected to drug trafficking. 18 U.S.C. § 983(c)(1) & (3). Circumstantial evidence can establish that burden of proof. United States v. $84,615 in U.S. Currency, 379 F.3d 496, 501 (8th Cir. 2004). The government does not necessarily have to show a connection between the seized property and a specific drug transaction. United States v. $150,660.00 in U.S. Currency, 980 F.2d 1200, 1205 (8th Cir. 1992).

The defendant currency totaled nearly $36,000, was banded in $2000 bundles, and was found double-bagged in plastic within a duffel bag. Eighth Circuit has "adopted the common-sense view that bundling and concealment of large amounts of currency, combined with other suspicious circumstances, supports a connection between money and drug trafficking." United States v. 124,7000 in U.S. Currency, 458 F.3d 822, 826 (2006) (internal citations omitted); see also United States v. $117,920.00 in U.S. Currency, 413 F.3d 826 (8th Cir. 2005) (seized money hidden beneath clothing, wrapped in a plastic sack, and in a piece of luggage and evidence of concealment by the claimant); United States v. $12,390.00 in U.S. Currency, 956 F.2d 801 (8th Cir. 1992) (noting that currency wrapped in rubber bands was characteristic of the way drug money is stored). Kubo, a reliable and certified drug detection canine, indicated to the odor of illegal drugs at the trunk of the rental car, and then independently to the money itself, which strongly supports a connection between the currency and drug trade. See United States v. $84,615 in U.S. Currency, 379 F.3d 496, 502 (8th Cir. 2004). The fact that Telich, who rented the vehicle, was not in the vehicle, and an unopened air freshener was located in the rental car, further supports a finding that the vehicle itself was being used for illegal drug trafficking. See $124,700 in U.S. Currency, 458 F.3d at 826. At the time of the stop, Bell and Derrick Anderson provided inconsistent stories about where they were going.

At the time of the stop, Bell stated they had been driving for "a couple of hours" before the traffic stop. But based on the trial testimony, they had driven 700 miles and through the night before being stopped in Nebraska. Bell was the subject of a Florida arrest warrant, and Derrick Anderson was previously convicted on felony charges of distributing marijuana.

Based on the totality of the evidence presented, the court finds the government has proved, by a preponderance of the evidence, that the seized currency located in the trunk of the rental vehicle is substantially connected to illegal drug trafficking.

If the government meets its burden, the claimant may nonetheless prevail if he proves, by a preponderance of the evidence, that he is an "innocent owner" of the seized currency. 18 U.S.C. § 983(d)(1). To qualify as an innocent owner, the claimant must prove he has an ownership interest as defined in the statute. Under the civil forfeiture statute, the term "owner" includes "a person with an ownership interest in the specific property sought to be forfeited," and excludes "a nominee who exercises no dominion or control over the property." 18 U.S.C. § 983(d)(6)(A) and (B); United States v. One Lincoln Navigator, 328 F.3d 1011, 1014 (8th Cir.2003). An "innocent owner" is "an owner who (i) did not know the conduct giving rise to the forfeiture; or (ii) upon learning of the conduct giving rise to the forfeiture, did all that reasonably could be expected under the circumstances to terminate such use of the property. 18 U.S.C. § 983(d)(2)(A). A claimant bears the burden of proving he was an innocent owner by a preponderance of the evidence. United States v. One 1989 Jeep Wagoneer, 976 F.2d 1172, 1174 (8th Cir. 1992).

Terry Anderson claims he placed his life savings—money he was saving for a surgical procedure—in plastic bags within a duffel bag, tossed the duffel bag with his laundry in the trunk of his brother's rental car, and forgot it there. This story is

implausible and not credible, particularly coming from someone so conscientious about protecting his money that he refused to keep it in his closet following a robbery in his apartment building, or to keep it in the bank where he had an account. As to the money itself, depending on who was talking and when the statements were made, Terry Anderson's intended purpose for the money was to either buy some property or to pay for surgery, the money from Zenith Anderson was either a gift or a loan, Telich owned either some or none of the money, and Zenith Anderson owned either some or none of the money.

The witnesses' stories about the events preceding the trip, and how the money managed to get into the rental vehicle trunk, were likewise inconsistent. Terry Anderson claims he placed the cash in the trunk when Derrick Anderson gave him a ride to Zenith Anderson's house: Derrick Anderson claims he did not pick up Terry Anderson that day. Terry Anderson claims Derrick Anderson drove him to the laundromat; Derrick Anderson states he picked up a nephew and some friends (but not Terry Anderson) and drove to Zenith Anderson's house; and Zenith Anderson states Terry Anderson did his laundry at her house. And perhaps most importantly, there is no evidence explaining why Terry Anderson's cash, which he allegedly withdrew from his bank account for storage in his closet, had an odor of illegal drugs when, in all other testing, Kubo did not detect an odor of drugs on circulated cash.

Having personally observed and listened to the witnesses as they testified,[2] the court finds the testimony of Derrick, Terry, and Zenith Anderson was not credible. Terry Anderson has failed to prove he owns the defendant currency. And even if the court assumes he is the owner, Terry Anderson has failed to prove that he did not know the money was being used for illegal drug trafficking, or that, upon learning it was being

---

[2] The claimant and his witnesses appeared by videoconference. The court was able to clearly see them while they testified.

used for that purpose, he did everything he reasonably could to prohibit that use of his money. The Claimant has failed to meet his burden of showing by a preponderance of the evidence that he is an innocent owner of the defendant currency.

Accordingly,

IT IS ORDERED:

1) The claim of Terry Anderson, ([Filing No. 10](Filing No. 10)), is denied and dismissed.

2) Judgment will be entered in accordance with this memorandum and order.

February 22, 2016

BY THE COURT:

*s/ Cheryl R. Zwart*
United States Magistrate Judge